**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**M.B., a minor child, by and through her mother**
**and next friend NICOLE MARTIN,**

                    **Plaintiffs,**

                                                    **5:04-CV-1255**
                                                    **(NAM/GHL)**

**v.**


**LIVERPOOL CENTRAL SCHOOL DISTRICT,**

                    **Defendant.**
_____

**APPEARANCES:**                               **OF COUNSEL:**

Liberty Counsel - Florida Office              Mathew D. Staver, Esq.
1055 Maitland Center Commons
Second Floor
Maitland, FL 32751-7214
_For Plaintiffs_

Liberty Counsel - Virginia Office             Erik W. Stanley, Esq.
100 Mountain View Road                        Rena M. Lindevaldsen, Esq.
Suite 2775
Lynchburg, VA 24502-2272
_For Plaintiffs_

Office of Frank W. Miller                      Charles E. Symons, Esq.
6296 Fly Road                                  Frank W. Miller, Esq.
East Syracuse, NY 13057
_For Defendant_

Evans Law Firm                                 James P. Evans, Esq.
421 South Warren Street
Suite 103
Syracuse, NY 13202
_For Defendant_

**Norman A. Mordue, Chief Judge:**
                    **MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff M.B., a minor, filed this action through her mother and next friend, plaintiff Nicole Martin ("plaintiffs"), against the Liverpool Central School District ("the District"), pursuant to 42 U.S.C. § 1983.  This action stems from the District's denial of M.B.'s request to distribute a "personal statement" flyer, concerning the impact Jesus Christ has had on her life, to some of her friends and classmates at Nate Perry Elementary School during non-instructional time.  In the complaint, plaintiffs allege that the District's "actions and policy" violated M.B.'s First Amendment right to Freedom of Speech (First Cause of Action); the Equal Protection Clause under the Fourteenth Amendment (Second Cause of Action); and the Establishment Clause of the First Amendment (Third Cause of Action).

Presently before the Court are four motions: plaintiffs' motion for a preliminary injunction directing the District to allow M.B. to distribute her religious flyer (Dkt. no. 9); plaintiffs' motion to waive the posting of a security bond for any preliminary injunction (Dkt. no. 10); plaintiff's motion for summary judgment (Dkt. no. 23); and the District's motion for summary judgment (Dkt. no. 25).

## II.     BACKGROUND

The facts in this case,[1] unless otherwise noted, are undisputed.  M.B., at the time of the filing of the motions for summary judgment, was a fifth grade student at Nate Perry Elementary School.  In the Fall of 2003, while in third grade, M.B. handed out approximately 20 religious Halloween tracts to friends during lunchtime.  One week later, M.B.'s teacher confronted M.B.

---

[1]These facts are from the parties' summary judgment submissions.

with one of the Halloween tracts, and, after learning that M.B. had passed it out to her friends, M.B.'s teacher instructed her not to do so again, warning that she would "be in big trouble" if she did.

The following April, M.B.'s mother, Ms. Martin, gave M.B. tracts entitled "Cleo" and told M.B. she could bring them to school to give to her friends during recess or lunchtime. Cleo is a children's booklet that analogizes the recovery of a lost dog to Christian salvation, and had M.B.'s church's name stamped on the back. M.B. asked her teacher if it she could hand out the tracts. M.B.'s teacher asked to hold on to the tracts until lunch, but did not return them. Later that day, Ms. Martin received a telephone call from the school principal who stated that the District could not allow M.B. to promote her church to students, even during non-instructional time. The principal explained the District was concerned that if a student brought the tract home, the parents might assume that the District endorsed the tracts.

Ms. Martin testified that she met with the school principal the next day. The principal advised that M.B. would not be allowed to pass out the tracts. Ms. Martin inquired whether there was a school policy. The principal, who was new to the school, replied that she believed there was, but could not locate it. Ms. Martin told the principal that she was concerned that the District was violating M.B.'s free speech rights and right to express her religion. The principal responded that the District policy prohibited M.B. from passing out "this kind of thing" because of the separation between church and state. The principal also explained that because M.B.'s church's name was stamped on the back of the tract, it appeared that M.B. was trying to endorse her church to other students. Ms. Martin testified that she offered to provide tracts without the church's name stamped on the back, but that the principal responded "no, that's not even an

issue." The principal advised Ms. Martin to contact the Superintendent of Elementary Education for more details.

The next day, Ms. Martin contacted the secretary to the Superintendent of Elementary Education, who referred her to Kevin Nuzzo, the Assistant to the Superintendent of the Liverpool Central School District. Ms. Martin contacted Mr. Nuzzo the following week, explained the situation, and asked whether there was a school policy regarding "kids passing things out at school." Mr. Nuzzo replied that there was and that he would make it available to her. Ms. Martin testified that they talked about the "freedom of speech aspect" and that she suggested Mr. Nuzzo contact counsel to discuss this issue.

Ms. Martin testified that on or about April 23, 2004, she received a copy of the District's policy on the distribution of materials and a letter from Mr. Nuzzo dated April 20, 2004. The letter stated:

> This letter will address your inquiry regarding your daughter's request to distribute certain religious material during lunch at Nate Perry Elementary School. As I indicated to you during our recent conversations, the District has a policy that addresses requests to distribute material in its schools. That Policy (No.: KFA-r) states, in relevant part:
>
>> Requests for school assistance with the distribution of literature which is not primarily of a proprietary nature and which may address student needs and/or interests shall be forwarded to the Assistant to the Superintendent of Schools with a copy of the item to be distributed not later than one week prior to the intended distribution date.
>
> It requires the Assistant to the Superintendent of Schools to review the literature and to advise the building principal and requester of the decision. If the requester wishes, it may appeal the determination to the Superintendent of Schools. I had offered to provide you with this policy earlier, and I enclose it now for your review.

I had also asked the District's counsel to consider this issue, setting aside the applicable policy. I am enclosing a copy of the letter that counsel provided in this regard.[2] I would be happy to discuss the issue with you further, if you like, but I am not in a position to supplement or detract from counsel's opinion.

Verified Complaint, Ex. B. The policy, "KFA-r", which refers to "School-Community Relations" and "Special Interest Materials" provides:

Requests for school participation in the distribution of literature which is primarily of a proprietary nature and serving no school purpose, shall be denied.

Requests for school assistance with the distribution of literature which is not primarily of a proprietary nature and which may address students [sic] needs and/or interests shall be forwarded to the Assistant to the Superintendent of Schools with a copy of the time to be distributed not later than one week prior to the intended distribution date. Such requests shall include the name of the organization requesting permission to distribute literature and the designation of the intended recipients.

The Assistant to the Superintendent shall review the request to distribute literature to students. If authorization is granted, the Assistant to the Superintendent shall so inform building principals and the requester. If authorization is not granted, the Assistant to the Superintendent shall advise the requester.

The decision of the Assistant to the Superintendent may be appealed to the Superintendent of Schools whose decision shall be final.

Upon receipt of approval, the distributor shall bundle the literature to be distributed in bundles of thirty and deliver the bundles in appropriate quantity to the schools not later than the day before the intended distribution to students. Distribution on the day requested is not guaranteed.

In an affidavit, Mr. Nuzzo explained the reasoning behind the policy:

As to the policy regarding the distribution of flyers from non-profit community based organizations, we have adopted this rule to allow for the orderly distribution of these materials from community based groups. The student is not directly involved in the distribution. Often, however, the teachers distribute the

---

[2] The copy of the letter submitted in connection with the instant motions, attached to Dkt. no. 26, Ex. 10, is incomplete and its admissibility is questionable because it is introduced through attorney affidavit, and attached to defendant's Rule 26(a)(1) disclosure.

flyers to each of the students in the classes on an equal basis.  There is no individualized selection.

The materials in question are all examined by me, in advance, to ensure that they are appropriate flyers, containing no inappropriate language, or improper content.  By allowing a routine, established distribution in class through the teacher, we avoid unnecessary controversy among students and also avoid a problem of the students throwing the materials away and creating litter.  The students are expected to take these flyers home in their backpacks and present the materials to the parents.  We do not permit, or allow, solicitation of students by these community based organizations within the school.

Nuzzo Aff. ¶¶ 10-11.  Examples of flyers approved for distribution include flyers advertising Syracuse Children's Theathre classes and presentation of "the Dragonslayer", "Liverpool Central School District Day with the SkyChiefs" baseball team, The Liverpool Village Merchants Village Historical Halloween Festival and Christmas Calendar, "Laughing with US: Comedy and Disability Kids' CartoonFest", Town of Salina Winter Recess Activities, and The Golfers Dome Junior Golf Club Open House.  Superintendent Matousek and Mr. Nuzzo testified that these flyers were approved because they bore some connection to school/community relations, furthered the District's goal of assisting families in providing activities so their students are safe either after school or during a vacation period, or were connected to the educational process.  For instance, Superintendent Matousek stated that at the secondary level, the District has a golf club and that students learn to play golf as part of their physical education, therefore The Golfer's Club open house was connected to the educational process.

In a letter dated May 3, 2004, to Mr. Nuzzo, Ms. Martin wrote, in relevant part:

I have received your letter and a copy of the district's policy, but I don't believe this policy relates to our request because we do not need the participation of the school, or its assistance.  She would like to distribute literature herself, to her

fellow friends and classmates on an occasional basis, but only during non-instructional times such as recess, before and after school, on the bus, and at lunch.

I have attached a copy of one of the pieces of literature that she would like to distribute, which is entitled, "Jesus Saves," and it was created by my daughter. The second piece of literature, entitled, "Cleo," you already have a copy because it was mailed to your office by the Principal at Nate Perry Elementary School. When my daughter has tried to distribute literature in the past, she was told by the school that she could never pass out religious literature while on school property . . . . I appreciate your prompt response to my request.

Verified Complaint, Exhibit C. M.B.'s "Jesus Saves" flyer states:

JESUS SAVES!!

Hi! I am [M.B.] and would like to tell you about Jesus Christ and God His Father.
1.       God sent his son (Jesus Christ) to come down on Earth and die on the cross for our sins.
2.       God loves us so much he made a way for us to get to Heaven (which is why he sent his son here to die on a cross).
3.       Here is a verse from the Bible for you to read: (In Romans 10:9)
         That if thou shalt confess with thy mouth the Lord Jesus, and shalt believe in thine heart that God hath raised him from the dead, thou shalt be saved. Jesus said, "Ye must be born again."
4.       I am going to ask you to please take the time to pray the simplest prayer (which can be like) Dear Lord Jesus, please forgive me, I am a sinner and don't want to die and burn in a pit of fire for an eternity! Please come into my heart and by my personal Lord and Savior.  In Jesus name I pray. Amen.

Nicole [Martin] Bloodgood Deposition, Ex. 16.

In a letter dated May 7, 2004, Superintendent Janice Matousek wrote to Ms.

Martin that she "received a copy of the May 3, 2004 letter you wrote to Kevin Nuzzo,

along with a copy of the information your daughter . . . would like to distribute to her

fellow friends and classmates.  As requested, I have shared a copy of both with the

members of the Board of Education."

Ms. Martin testified that because she had not received a response from Mr. Nuzzo, she left copies of the Cleo tract and the Jesus Saves flyer at the Superintendent's office and asked that the Superintendent and the School Board decide whether either would be acceptable for M.B. to distribute to students during non-instructional time.

On May 20, 2004, Ms. Martin called the secretary to the Superintendent and learned that the school board had decided not to render a decision.

On or about May 21, 2004, Ms. Martin received a letter from Mr. Nuzzo dated May 19, 2004, denying her request:

> This letter responds to your request that your daughter be allowed to distribute religious material to other students in her third grade class during the school day. Specifically, you have asked that the District allow her to distribute a booklet entitled Cleo, which is a child's book that analogizes the recovery of a lost dog to Christian salvation. That book is stamped on the back with the name and address of the Calvary Bible Baptist Church. You have also asked that she be allowed to distribute a document that you state she wrote, entitled, "Jesus Saves." Both documents are fairly described as proselytizing material.
>
> Several weeks ago, I asked the District's legal counsel to consider whether it is appropriate for you[sic] daughter to distribute the Cleo booklet. In large part because of the age of the students involved and the degree of District supervision and control over third grade students throughout the school day, counsel concluded that such distribution was not appropriate. I shared that letter with you at that time. For the reasons set forth in that letter, and for the five reasons stated herein, I must decline your recent request.
>
> First, the School District must be mindful of the tender age of the students to whom you seek to distribute the material. Several courts, including the Supreme Court, have concluded that young children do not have the same capacity to discern between messages that are simply permitted by a school district in recognition of the First Amendment free speech rights of their students and those messages that are actually endorsed by the school district. I believe that third grade students will not be able to appreciate this distinction.
>
> Second, it is also far from clear that third grade students would feel comfortable declining materials offered by a classmate. Potentially, students could be made to

feel unwarranted pressure in responding to the offer of such materials.  This fact has the further potential to create unnecessary divisiveness within the class.

Third, public school authorities have an obligation to closely supervise and control third grade students throughout the day.  It is well recognized that there is very little that such students can do that does not have the express or tacit approval of the school authorities.  Under the circumstances, there is a high possibility for both the children and their parents to mistakenly conclude that the School District actually endorses and fosters any proselytizing materials that it permits students to distribute on school grounds during the school day.

Fourth, allowing your church to distribute the Cleo book through students on school premises during the academic day is inappropriate.  No other Church has ever sought to do this, and the District has not permitted the dissemination of religious information by or to its students.  If we were to grant your request, we would have to grant similar requests made by any other entity.

Fifth, to allow the distribution of such materials to third grade students during the school day will have the likely effect of interjecting subjects into classroom discussions that are outside of the pedagogical control of the School District and not part of the curriculum.

For all the foregoing reasons, I feel constrained to deny your request.  You have indicated that your daughter only seeks to distribute this material to her friends, but that really is not the point.  The point is that students and/or their parents will almost certainly be confused about the School District's role in the distribution of these materials and there is a substantial probability they will perceive that the School District is endorsing such materials.  This conclusion may be different at a higher grade level.  However, in elementary school, the danger is omnipresent.

Please advise if you have any question regarding this letter, and thank you for your patience.

Verified Complaint, Exhibit D.

On June 25, 2004, after school had ended for the year, Ms. Martin asked Mr. Nuzzo whether M.B. could distribute a "personal statement" flyer to her friends, during non-instructional time, in fourth grade.  This flyer states:

Hi!  My name is [M.B.] and I would like to tell you about my life and how Jesus Christ gave me a new one.  I asked Him to come into my heart and save me from my sins.  This is what he has done for me.

1.  Jesus Christ helped my parents decide to get remarried in November and then I will get to see my dad every day.

2.  He helped [me] memorize Bible verses and say them in front of my church.

3.  He helped me learn piano and play psalms and hymns and sing with grace  in my heart to the LORD.

4.  God cared enough about me that He gave me the victory over thinking about something bad that happened to me.

5.  Now that I am saved, God gave me a peace in my heart and the truth that I am going to heaven instead of the other place.

PRAISE THE LORD!

Verified Complaint, ¶ 20.  It is this flyer that is at issue in this action.

On June 29, 2004, Ms. Martin and M.B. met with Mr. Nuzzo to discuss their request. Ms. Martin testified that they explained to Mr. Nuzzo that M.B. would bring in a few flyers at a time to school to pass out to her friends when class was not in session and that it would not interfere with the school day or impede on anything in the classroom.  Ms. Martin testified that Mr. Nuzzo responded that he would have to consult counsel, but that he believed the answer would be no because he had "no way of controlling how many of those will be passed out" and that he had to deny requests all the time.

Mr. Nuzzo testified that he and Superintendent Matousek were concerned about the "messaging" in the flyer and that they wanted to consult counsel.  Mr. Nuzzo stated that M.B. was not "following our policy.  The method and the manner and how we distribute."  According to Mr. Nuzzo, M.B.'s request did not comply with the District's policy because she was "asking to . . . do this on her own when we do not let students when they come to us . . . with a flier to do this on our own.  We do it in a controlled environment, management, and the times that we

want to."  Mr. Nuzzo further testified that if plaintiffs had asked for the flyer to "be bundled in a group of 30 and handed out through the teachers to every student in the class" plaintiffs "would have been closer to the regulations" but that he could not "honestly say if counsel would want to represent a discussion of the material and the content in it, whether or not it was serving the school purpose."

On or about September 2, 2004, Mr. Nuzzo contacted Ms. Martin to inform her that the request was denied.  Ms. Martin later went to Mr. Nuzzo's office and informed him that she received his message and "would like to appeal that decision to the school board and superintendent".  Ms. Martin also provided a copy of the following letter to Mr. Nuzzo, the School Board, and the superintendent:

> I am writing on behalf of my daughter . . . a fourth grade student at Nate Perry Elementary School.  She wants to distribute a flyer that is a personal statement from [M.B.] . . . .  I have attached a copy of her flyer to this letter for your review.  My daughter requested permission from Assistant Superintendent Kevin Nuzzo to pass out the flyer to some of her friends and fellow classmates during non-instructional times at school, such as the school bus, before or after class, during recess or lunch.  She was told that she could not, due to the flyer's religious content.  Please respond to me as soon as possible as she wants to be able to distribute her flyer when school opens.

Verified Complaint, Ex. E.

Shortly after making this request, Mr. Nuzzo contacted Ms. Martin to inform her that it had been denied.  In a letter dated September 8, 2004, Superintendent Matousek confirmed this decision:

> This letter is to confirm the conversation you had with Susan Grier from my office on Tuesday afternoon.  As requested, I shared a copy of the letter you dropped off last week with the Board of Education.

> For the reasons outlined in Mr. Nuzzo's May 19, 2004 letter to you (copy attached), your request that [M.B.] be allowed to pass out her personal statement (also attached) to some of her friends and fellow classmates during non-instructional times at school, including but not limited to on the school bus, before or after class and/or during recess or lunch, is again denied.

Verified Complaint, Ex. F.

Superintendent Matousek testified that M.B.'s request was not consistent with the policy because she did not designate the entire class as recipients of her materials.  Consequently, Superintendent Matousek stated, the request did not "trigger" the policy at which point "a decision would have been made.  Again, that's all speculation at this point."  Superintendent Matousek further testified that the flyer was not connected to the educational process because "We don't teach religion . . . in fourth grade".  Mr. Nuzzo stated in his affidavit that:

> It should be noted that at no time did the Plaintiff request permission to distribute materials from her church (a community based organization), in accordance with the policy.  In fact, Mrs. Martin was informed of the existence of the policy and provided with a copy of the same . . . .  After this was done, she still did not make any effort to comply with the policy, nor did she request an opportunity to distribute materials in accordance with the policy.
>
> To the contrary, as the Affidavits in question reveal, the minor Plaintiff . . . wants to be able to select those students within her class, whom she deems appropriate, to distribute materials to about her church and about her religious faith.  The student, not the District or the teacher, would select the time, location and the manner of the distribution.  The student, not the teacher or the district, would determine the content of any message that accompanied the distribution of the materials.
>
> ****
>
> While we recognize that academic concerns may not be applicable at all times, such as on the bus, we have other concerns about distributions occurring in that manner. For example, if distributions occur on the school bus, and children decline to accept the materials, this could produce a litter problem, or if the children disagree about the distribution, could result in arguments or other similar episodes occurring.

> The policy of [the District], has been in existence for the past 11 years in the District. It has worked well. We are not closing our door to any properly constituted non-profit, community based organization. In this particular case, the Plaintiffs do not seek to access the children through the process of distribution in accordance with the policy but, rather, seek to effectively create their own policy where the District has no control over the distribution of these materials.

On October 28, 2004, plaintiffs filed this action seeking, *inter alia*, injunctive relief directing the District to allow M.B. to distribute her "personal statement" flyer to her friends and classmates.[3]

## III.   DISCUSSION

### A.   Summary Judgment

A party moving for summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the Court, viewing the evidence in the light most favorable to the nonmovant, determines that the movant has satisfied this burden, the burden then shifts to the nonmovant to adduce evidence establishing the existence of a disputed issue of material fact requiring a trial. *See id*. If the nonmovant fails to carry this burden, summary judgment is appropriate. *See id*.

Plaintiffs seek summary judgment on their Free Speech cause of action. The District opposes plaintiffs' motion and seeks summary judgment dismissing plaintiffs' Free Speech, Equal Protection, and Establishment Clause causes of action. Plaintiffs oppose defendant's motion and seek summary judgment on their Free Speech claim.

### B.   First Cause of Action - Free Speech

---

[3] There is no indication in the complaint that plaintiffs seek any relief with regard to the Cleo Booklet or "Jesus Saves" flyer.

### 1.      KFA-r – As Applied[4]

Plaintiffs claim that the District violated M.B.'s First Amendment right to Free Speech when it prohibited her from distributing flyers with a religious message to her classmates. Specifically, plaintiffs assert that the District violated her right to Freedom of Speech, because it engaged in viewpoint and/or content discrimination in refusing her request.

### a.      Nature of the Forum[5]

The level of judicial scrutiny depends on the nature of the forum in which the speech occurs.  *See Bronx Household of Faith v. Community Sch. Dist. No. 10*, 127 F.3d 207, 211 (2d Cir. 1997) ("Freedom to speak on government property is largely dependent on the nature of the forum in which the speech is delivered.").  Fora for expression are classified in "four categories that, correspondingly, fall along a spectrum of constitutional protection", *Peck*, 426 F.3d at 625, from highest to lowest: the traditional public forum; the designated public forum, and its subset, the limited public forum; and the non-public forum.  *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 142-43 (2d Cir. 2004).

---

[4] As the discussion indicates, although plaintiffs label their argument an "as applied" challenge to the District's reliance on KFA-r in denying their distribution request, the evidence reveals that the District's application of KFA-r was not the sole basis for the District's denial of their request.  Thus, plaintiffs' arguments cannot be characterized solely as an "as applied" challenge to KFA-r.

[5] Plaintiffs posit that the Court need not engage in the forum analysis in this case because it is manifest that the standard for evaluating the First Amendment and student expression set forth in *Tinker v. Des Moines Independent Community Sch. District*, 393 U.S. 503 (1969), applies.  In *Peck ex rel. Peck  v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 626-27 (2d Cir. 2005), the Second Circuit addressed the nature of the forum prior to reaching the issue of whether *Tinker* or *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260 (1988) governed.  In contrast, in *Guiles ex rel. Guiles v. Marineau*, also a student speech case, the Second Circuit did not conduct a forum analysis before concluding that *Tinker* applied to the speech at issue. 461 F.3d 320 (2d Cir. 2006).  Because the parties in this case have addressed the forum issue in this case, the Court will not bypass it.

In a traditional public forum, that is, places "held in trust" for public use, streets and parks, for example, the state may make content-based restrictions only if those rules are "'necessary to serve a compelling state interest and . . . narrowly drawn to achieve that end.'" *Id*. at 142 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

"A 'designated public forum' is a place not traditionally open to public assembly and debate - a public school, for example - that the government has taken affirmative steps to open for general public discourse." *Peck*, 426 F.3d at 626. When, however, the state "'opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects'" it creates a "limited public forum". *Hotel Employees & Rest. Employees Union Local 100 v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 545 (2d Cir. 2002) (quoting *N.Y. Magazine v. Metro. Transp. Auth.*, 136 F.3d 123, 128, n.2 (2d Cir. 1998) (internal quotation marks omitted)). If the state "does no more than reserve eligibility for access to the forum to a particular class of speakers, whose members must then, as individuals, obtain permission to use it" then the property remains a nonpublic forum. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 679 (1998) (internal quotation marks omitted).

Examples of limited public fora include state university meeting facilities opened for student groups, *see Widmar v. Vincent*, 454 U.S. 263, 267 (1981), open school board meetings, *see City of Madison Joint Sch. Dist. No. 8 v. Wis. Employment Relations Comm'n*, 429 U.S. 167, 174-76 (1976), city-leased theaters, *see Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555-56 (1975), and subway platforms opened to charitable solicitations, *see Young v. N.Y.C. Transit Auth.*, 903 F.2d 146, 161-62 (2d Cir. 1990). Rules governing the content of speech in a limited public forum must be reasonable and viewpoint-neutral. *Hotel Employees*, 311 F.3d at

15

545-46.  In a limited public forum, the government may enforce reasonable time, place, and manner restrictions on speech so long they are "' justified without reference to the content of the regulated speech,' . . . 'narrowly tailored to serve a significant governmental interest,' and 'leave open ample alternative channels for communication.'" *Cornelius v. NAACP Legal Defense and Educational Fund, Inc*., 473 U.S. 788, 818 (1985) (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

A nonpublic forum is a government property that has not been opened for public speech either by tradition or by designation.  *See Perry*, 460 U.S. at 46.  In such a forum, the government may make a distinction in access on the basis of subject matter and speaker identity and "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."  *Id*.  In nonpublic forums, the government may make "time, place and manner restrictions and 'reasonable' content-based regulations."  *Travis v. Owego-Apalachin Sch. Dist*., 927 F.2d 688, 692 (2d Cir. 1991).  Thus, courts will "uphold a governmental restriction on speech in a nonpublic forum as long as the restriction is reasonable and viewpoint-neutral."  *Perry v. McDonald*, 280 F.3d 159, 169 (2d Cir. 2001) (citing *Perry*, 460 U.S. at 46; *Cornelius*, 473 U.S. at 800).

To determine the type of forum, the Court must examine "the policy and practice of the government" and "the nature of the property and its compatibility with expressive activity."  *Cornelius*, 473 U.S. at 802.  In conducting this analysis, the Court must "ascertain whether [the government] intended to designate a place not traditionally open to assembly and debate as a public forum."  *Id*.

The District asserts, and plaintiffs do not dispute, that the school premises are a limited public forum for written communication.  Alternatively, the District asserts, KFA-r creates a limited public forum for the distribution of written material on school premises.  Generally, school facilities are nonpublic forums.  *Cf. Hazelwood,* 484 U.S. at 267 ("[S]chool facilities may be deemed to be public forums only if school authorities have by policy or practice opened those facilities for indiscriminate use by the general public or by some segment of the public . . . . If the facilities have instead been reserved for other intended purposes, communicative or otherwise, then no public forum has been created . . . .") (internal quotations omitted).  Here, the evidence shows that the District, through KFA-r, allows, or intends to allow, students, non-profit community based organizations, and for-profit organizations with a connection to the District, to arrange for the distribution of written materials to students, so long as the content serves a school purpose or addresses student needs or interests.  Although KFA-r does not state or imply that it applies to written material students wish to distribute to other students, the parties agree that the District intends it to apply to students as well.  Thus, the District established a limited public forum for the distribution of written materials.  Having done so, it may make reasonable, viewpoint neutral rules governing content and enforce reasonable time, place, and manner restrictions with respect to written materials.

### b.      Private Expression or School Sponsored Expression

Because student expression is at issue, "the nature of-and level of constitutional protection to be accorded to" M.B.'s flyer depends on whether it is private or school sponsored speech.  *Peck*, 426 F.3d at 627.  Therefore, when addressing the reasonableness of restrictions public school authorities impose on student expression, courts consider whether the student

speech at issue is "tolerated" expression (also referred to as "private" expression) or

"promoted" expression (also referred to as "school-sponsored" expression).

> The question whether the First Amendment requires a school to tolerate particular student speech ... is different from the question whether the First Amendment requires a school affirmatively to promote particular student speech. The former question addresses educators' ability to silence a student's personal expression that happens to occur on school premises. The latter question concerns educators' authority over school-sponsored publications, theatrical productions, and other expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school. These activities may fairly be characterized as part of the school curriculum, whether or not they occur in a traditional classroom setting, so long as they are supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences.

> Educators are entitled to exercise greater control over this second form of student expression to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school.

*Hazelwood,* 484 U.S. at 270-71 (footnote omitted.). The *Hazelwood* court added that

"educators do not offend the First Amendment by exercising editorial control over the style and

content of student speech in school-sponsored expressive activities so long as their actions are

reasonably related to legitimate pedagogical concerns." *Id*. at 273.

> *Tinker* governs a student's "personal expression that happens to occur on the school

premises". *Tinker*, 393 U.S. at 512. In *Tinker*, the Supreme Court held that the First

Amendment did not allow the school district to silence students who wore black arm bands in

opposition to the Vietnam War:

> The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. Among those activities is personal intercommunication among the students. This is not only an inevitable part of the process of attending school; it is also an important part of the

> educational process. A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions, even on controversial subjects like the conflict in Vietnam, if he does so without materially and substantially interfer(ing) with the requirements of appropriate discipline in the operation of the school and without colliding with the rights of others. But conduct by the student, in class or out of it, which for any reason-whether it stems from time, place, or type of behavior-materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech.

*Id*. at 512-13 (internal footnote, quotation marks, and citation omitted).

The parties contest the nature of M.B.'s speech.  Plaintiffs contend that the standard set forth in *Tinker* applies because the flyer is M.B.'s private speech that she composed and wishes to distribute to friends and classmates of her choosing during non-instructional time without the District's involvement.  The District asserts that the only way M.B. can distribute her flyer is through the process set forth in KFA-r,[6] which would require teachers to distribute the flyer to every student in M.B.'s class.  Therefore, the District argues, students, or their parents, reasonably could conclude that given the extent of its involvement in the distribution process as illustrated by KFA-r and the flyers it has approved pursuant to KFA-r in the past, students or parents reasonably could perceive flyers distributed pursuant to KFA-r as bearing the imprimatur of the school, making M.B.'s otherwise private expression, school sponsored within the meaning of *Hazelwood*.

The undisputed evidence shows that the District denied plaintiffs' request to distribute written materials on two premises:  first, because plaintiffs failed to comply with KFA-r; and,

---

[6]When the parties refer to KFA-r, their reference includes the District's unwritten time, place, and manner regulation of written speech, which requires that teachers distribute written material to every class member at the end of the school day.

second, regardless of KFA-r, because plaintiffs' proposed method of distribution might lead to "unnecessary divisiveness" among students and the proselytizing nature of the flyers might interject subjects into classroom discussions that are outside the elementary school's curriculum and lead elementary students or their parents to conclude that the District endorses and fosters Christianity.

Regarding the first aspect of the District's decision, viewing the facts in the light most favorable to the District a reasonable fact finder could conclude that the District's application of KFA-r to plaintiffs' distribution request, and its denial of that request based on plaintiffs' failure to comply with KFA-r, would survive constitutional scrutiny under the limited public forum and *Hazelwood* analyses.  The evidence shows that the District's actions, in requiring plaintiffs to comply with KFA-r and its distribution procedure, were reasonably related to the legitimate pedagogical concern of maintaining order in the elementary school setting and view point neutral.[7]   The Court must still consider, however, whether the second aspect of the District's decision, in which it specifically considered and denied plaintiffs' distribution request, notwithstanding KFA-r, violated M.B.'s right to Free Speech.[8]

---

[7]Although plaintiffs have submitted evidence that M.B. received notes and invitations from classmates at school, plaintiffs adduce no evidence that the District, *under KFA-r*, permitted distribution of written speech in the genre of M.B.'s personal statement.  *See Travis*, 927 F.2d at 692 ("in a limited public forum, government is free to impose a blanket exclusion on certain types of speech, but once it allows expressive activities of a certain genre, it may not selectively deny access for other activities of that genre.").

[8] Because the District expressly considered and denied plaintiffs' distribution request (and proposed method of distribution) separately from KFA-r, this aspect of its decision falls squarely before the Court.  *Cf. Heffron v. International Soc. for Krishna Consciousness, Inc*., 452 U.S. 640, 652 (1981) (finding that "the Minnesota Supreme Court took too narrow a view of the State's interest in avoiding congestion and maintaining the orderly movement of fair patrons on the fairgrounds. The justification for the [regulation of the distribution of written material] should not be measured by the disorder that would result from granting an

The evidence indicates that although the District denied plaintiffs' request on the basis that plaintiffs' failed to comply with KFA-r, it nevertheless went on to address plaintiff's request on its face and explain why it would not, in any event, permit M.B. to distribute her flyer to friends and classmates of her choosing during non-instructional time.  As discussed, as the letters, affidavits and deposition testimony of Superintendent Matousek and Mr. Nuzzo indicate, the District concluded that M.B.'s proposed manner of distribution directly to students, together with the proselytizing nature of the flyer, and controlled elementary school setting, would place the District in jeopardy of violating the Establishment Clause.  Neither Superintendent Matousek's letter dated September 8, 2004, which denied M.B.'s request to distribute her personal statement, nor Mr. Nuzzo's letter dated May 19, 2004, which Superintendent Matousek expressly incorporated in her letter, contain any reference to KFA-r as the justification for the District's denial of M.B.'s request to distribute copies of her flyer.  Rather, these letters set forth the District's reasons for refusing to allow M.B. to distribute her flyer directly to her friends and classmates.  Indeed, the District admits that the reasons set forth in these letters are among the reasons why it would not allow M.B. to distribute her flyer to friends and classmates.  *See* Def's Response to Plfs' Stmt. of Material Facts.

Even viewing these facts in the light most favorable to the District, the Court concludes that without the District's involvement in the distribution process under KFA-r, no elementary school student, parent, or member of the public reasonably could believe that flyers M.B. composed and gave directly to friends or classmates during non-instructional time were school

exemption solely to ISKCON. That organization and its ritual of Sankirtan have no special claim to First Amendment protection as compared to that of other religions who also distribute literature and solicit funds.").

sponsored.  Accordingly, the Court must determine whether the record discloses triable issues

as to whether the District, in denying M.B. permission to distribute her flyers directly to

students, exceeded "the authority which under *Tinker* they may constitutionally exercise" in

restraining her speech.  *Eisner v. Stamford Bd. of Educ.*, 440 F.2d 803, 808 (2d Cir. 1971).

In *Tinker*, the Supreme Court held that the First Amendment permits schools to censor

political speech which would "materially and substantially interfer[e] with the requirements of

appropriate discipline in the operation of the school" or collide with the rights of others.  *Tinker*,

393 U.S. at 513.  As the Second Circuit recently explained:

> Proceeding according to the understanding that *Tinker* applies to all non-school-
> sponsored student speech that is not lewd or otherwise vulgar, we note that if the
> "material and substantial interference" test is meant to describe vocal protests and
> disputes of similar character and magnitude, schools must tolerate a great deal of
> student speech that is not lewd or vulgar. Put differently, *Tinker* established a
> protective standard for student speech under which it cannot be suppressed based
> on its content, but only because it is substantially disruptive.

*Guiles*, 461 F.3d at 326.

In this case, the parties agree that the reasons the District cited for prohibiting M.B. from

distributing her flyers, which it described as "proselytizing material", were: (1) M.B.'s failure to

comply with its distribution policy, which requires that any distributions be made to all students

in a class, by the teacher; (2) M.B.'s request to distribute the flyers herself in an uncontrolled

manner might create a "litter problem", Nuzzu Aff. ¶ 17; (3) the tender age of the elementary

students to whom M.B. requested to give flyers and their inability to distinguish between

M.B.'s private speech and speech the District endorsed; (4) students might feel pressured to

accept and respond to flyers "offered by a classmate" which might create "unnecessary

divisiveness within the class"; (5) in view of the close supervision and control the District

exercises over the elementary school, students and parents might "mistakenly conclude that the District endorses and fosters proselytizing materials that it permits students to distribute on school grounds during the school day"; (6) allowing "the distribution of such materials to [elementary] students during the school day will have the likely effect of interjecting subjects into classroom discussions that are outside of the pedagogical control of the School District and not part of the curriculum"; and (7) "the parent would not have prior knowledge or notice before the time that the child was solicited and/or requested to participate in the activity or discussion" and this could infringe on the parental right to make decisions regarding the "religious education of one's children."  Def's Reply Mem. of Law,  Nuzzu Aff. ¶ 17.[9]

The District emphasizes that the "first" reason it denied M.B.'s request was her failure to comply with the policy.  It is uncontroverted, however, that the District also denied M.B.'s request based on the content of the flyer and its concern that students, parents, or others might perceive it as endorsed by the District, it might create divisiveness in the classroom, students might feel uncomfortable refusing M.B.'s attempt to give them flyers, and the content of the flyer might interject subjects outside the elementary curriculum.  The District has adduced no evidence showing that M.B.'s flyers would disrupt the elementary classroom, cause substantial disorder, or invade the rights of others.  Indeed, none of the reasons the District articulated for denying M.B.'s request indicate more than "undifferentiated fear or apprehension of disturbance", which is "not enough to overcome the right to freedom of expression."  *Tinker*,

---

[9] A number of these reasons are set forth in Nuzzo May 19, 2004, letter.  Although that letter addressed the "Jesus Saves" flyer, Superintendent Matousek expressly relied on and incorporated it in her letter dated September 8, 2004, in denying M.B. permission to distribute her personal statement flyer.

393 U.S. at 509-09.  Thus, to the extent that the District censored M.B.'s flyer without a reasonable belief that it would cause substantial disruption, it violated her First Amendment rights.

### c.      Establishment Clause Justification

The District asserts that its interest in avoiding an Establishment Clause violation justified any unwarranted censorship of M.B.'s flyer.  "[C]ensorship may be justified under *Tinker* only when the substantial disruption test is satisfied."  *Guiles*, 461 F.3d 320.  Even assuming that the District's interest in avoiding a violation of the Establishment Clause would justify its refusal to allow M.B. to distribute her flyer, given the private nature of M.B.'s speech, the facts of this case, even viewed in the light most favorable to the District, do not disclose a valid Establishment Clause concern.

The Establishment Clause "prohibits government from officially preferring one religious denomination over another:  'The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.'"  *Skoros v. City of New York*, 437 F.3d 1, 16 (2d Cir. 2006) (quoting *Larson v. Valente*, 456 U.S. 228, 244 (1982)).

A governmental practice which touches on religion does not offend the Establishment Clause if (1) it has a secular purpose, (2) it neither advances nor inhibits religion, and (3) it does not create an excessive entanglement of government with religion.  *See Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).  The Supreme Court has "been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools," *Edwards v. Aguillard*, 482 U.S. 578, 583-84 (1987).

### i.      Purpose

24

In addressing the first prong of the *Lemon* test – whether the government's regulation serves a secular purpose – courts consider whether the government is legislating in such a way as to abandon neutrality and to promote a particular religious point of view. *See Corporation of the Presiding Bishop v. Amos*, 483 U.S. 327, 335 (1987). The secularity requirement "is not intended to favor the secular over the religious, but to prevent the government from 'abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters.'" *Skoros*, 437 F.3d at 18 (quoting *Corporation of the Presiding Bishop*, 483 U.S. at 335).

In this case, there is no evidence from which a reasonable fact finder could conclude that the District, by allowing M.B. to distribute flyers that she drafted herself to other students, would be acting "with the intent of promoting a particular point of view in religious matters." *Skoros*, 437 F.3d at 18 (internal quotation marks omitted).

That the actual purpose is secular does not end the inquiry. In *McCreary County, Ky. v. American Civil Liberties Union of Ky.*, 545 U.S. 844 (2005), the Supreme Court instructed that courts must examine how "an objective observer, one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute, or comparable official act" would perceive the state's purpose. 545 U.S. at 862 (internal quotation marks omitted). In this case, the intended audience for the flyers includes elementary students. In such cases, "we assume the objective observer is an adult who, in taking full account of the policy's text, history, and implementation, does so mindful that the displays at issue will be viewed primarily by impressionable schoolchildren." *Skoros*, 437 F.3d at 23. This standard "strives to identify 'a personification of a community ideal of reasonable behavior determined

by the collective social judgment.'"  *Id*. at 24 (quoting *Capitol Square Review & Advisory Bd. v.* *Pinette*, 515 U.S. at 753, 780 (1995) (O'Connor, J., concurring in part and concurring in the judgment) (alteration and internal quotation marks omitted)).  In doing so, however, the Court should not "turn a 'blind eye' to the fact that schoolchildren are the intended audience".  *Id*.

The evidence in this case shows that an objective observer who knows that students, from time to time, pass notes and other materials to one another, who is familiar with the degree of control the District exercises over elementary students, and who knows that M.B. prepared the flyer at issue herself for the purpose of giving it to select friends and classmates,  would perceive that the District's purpose was secular in nature.  Thus, the Court finds that there is no issue of material fact with respect to the first prong of the *Lemon* test.

### ii.    Effect

To satisfy the second prong of the *Lemon* test, the government is required to show that (1) it did not act with the purpose of advancing or inhibiting religion; and (2) the action does not have the effect of advancing or inhibiting religion.  *See Agostini v. Felton*, 521 U.S. 203, 222-23 (1997).  In this respect, the government's conduct must not evince a preference for "those who believe in no religion over those who do believe," or convey a message of government disapproval of religion or hostility toward religion.  *School Dist. of Abington Twp., Pa. v.* *Schempp*, 374 U.S. 203, 225 (1963).

In this case, if the District permitted M.B. to distribute her flyers to friends and classmates, there is no evidence that it would have acted with the purpose of advancing religion. Rather, the evidence indicates that its concern centered on whether students, or parents,

receiving M.B.'s flyers would think that the District was attempting to advance Christianity and entice students to convert to Christianity.

A court reviewing an Establishment Clause challenge must consider "whether a 'reasonable observer . . . aware of the history and context of the community and forum in which the religious display appears,' would understand it to endorse religion . . . or one religion over another." *Skoros*, 437 F.3d at 30 (quoting *Capitol Square*, 515 U.S. at 780). When the challenged conduct occurs in the setting of a public school, "special concerns arise in the identification of a reasonable observer." *Id.* In *Skoros*, the Second Circuit concluded, in view of the range of the students to whom the challenged policy applied, that the:

> relevant objective observer, whether with respect to purpose or effect, is an adult who is "aware of the history and context of the community and forum in which the religious display appears" *Capitol Square*, 515 U.S. at 780 (O'Connor, J., concurring in part and concurring in the judgment), . . . and who understands that the display of a religious symbol in a school context may raise particular endorsement concerns, because of the pressure exerted on children by the "law of imitation," *Illinois ex rel. McCollum v. Bd. of Educ.*, 333 U.S. at 227 (Frankfurter, J., concurring).

*Id.* at 30-31.

It is apparent from its submissions that the District is concerned not only with providing a religiously neutral environment for its students, but also about the effect on schoolchildren of the proselytizing nature of M.B.'s personal statement. To the extent the proselytizing nature of the flyer is relevant to the Establishment Clause inquiry on the basis that schoolchildren would feel coercive pressure as a result of the flyers, *cf. Lee v. Weisman*, 505 U.S. 577, 592-93 (1992), the District has not adduced any evidence indicating that M.B.'s flyers would have that effect. Further, for the reasons discussed below, because there is no evidence that M.B.'s individual

27

actions put the District in the position of endorsing Christianity, the Court "cannot say the danger that children would misperceive the endorsement of religion is any greater than the danger that they would perceive a hostility" toward religion as a result of the District's denial of M.B.'s request to distribute her flyers. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 118 (2001). Thus, the Court concludes, based on the undisputed evidence, that an objective observer who understands the endorsement concerns that arise in a school context, and the degree of control school officials exercise over elementary school students would perceive the effect of the M.B.'s distribution of her flyers to be a matter of personal expression, not an endorsement of any particular religion, or of religion over non-religion. *See Marchi v. Board of Cooperative Educ. Serv. of Albany*, 173 F.3d 469, 476 (2d Cir. 1999) ("When courts adjudicate claims that some governmental activity violates the Establishment Clause, they must be careful not to invalidate activity that has a primary secular purpose and effect and only incidental religious significance."). Accordingly, the Court turns to the third prong of the *Lemon* test.

### iii.   Entanglement

The third prong of the *Lemon* test requires the Court to consider whether the challenged state action "foster[s] excessive state entanglement with religion." *Commack Self-Serv. Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 425 (2d Cir. 2002). To determine whether the entanglement is excessive, the Court "must examine the character and purposes in the institutions that are benefited" and evaluate the resulting relationship between the government and religious authority. *Lemon*, 403 U.S. at 615.

The District claims that if it allowed the distribution of flyers containing religious speech, namely proselytizing speech, it would become excessively entangled with religion.

28

"Entanglement is a question of kind and degree." *Lynch v. Donnelly*, 465 U.S. 668, 684 (1984). "[T]he First Amendment does not prohibit all interaction between church and state. The entanglement of the two becomes constitutionally 'excessive' only when it has 'the effect of advancing or inhibiting religion.'" *Skoros*, 437 F.3d at 36 (quoting *Agostini*, 521 U.S. at 233). The entanglement analysis is "properly treated as 'an aspect' of *Lemon*'s second-prong 'inquiry into a statute's effect.'" *Id*. (quoting *Agostini*, 521 U.S. at 233). The relevant factors are "'the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority.'" *Agostini*, 521 U.S. at 232 (quoting *Lemon*, 403 U.S. at 615).

Here, the only aid the District would provide is permission to M.B. to distribute copies of her flyer to her friends and classmates. There is no evidence any school official would say anything to any student about the flyers. Finally, there would be no consequential connection between the District and M.B., or any religious authority, which would suggest an ongoing relationship. Thus, there is no evidence from which a reasonable fact-finder could conclude that the distribution of M.B.'s flyers would create excessive entanglement. Thus, the Court finds that, even viewing the facts in the light most favorable to the District, the distribution of M.B.'s flyers do not implicate the Establishment Clause. Accordingly, the District's motion for summary judgment dismissing M.B.'s Free Speech claim is denied and M.B.'s motion for summary judgment on her Free Speech claim is granted.

### d.     Time, Place, and Manner

A conclusion that the District violated M.B.'s right to Free Speech does not end the inquiry in this case because, as stated, M.B. seeks to distribute her flyer directly to her friends

and classmates during non-instructional time.  Plaintiffs argue that the District's distribution procedure also violates M.B.'s Free Speech rights as a student because it "creates a situation where the Establishment Clause is . . . implicated."  Plfs' Mem. of Law in Opp. to Sum. Jud., p.13.  Plaintiffs' argument, therefore, is an "as applied"[10] challenge to the reasonability of the District's time, place, and manner regulation of the distribution of written material.  The District opposes plaintiffs' argument asserting that their claim is not ripe for review because plaintiffs contend that the District's policy does not apply to them.  The District further asserts that, in any event, KFA-r is a valid time, place, and manner regulation of written speech.

"The purpose of the ripeness requirement is to ensure that a dispute has generated injury significant enough to satisfy the case or controversy requirement of Article III of the U.S. Constitution. The ripeness requirement prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur, depending on the final administrative resolution." *Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148 (1967)).  The ripeness doctrine is somewhat relaxed in the First Amendment context.  *Id*.  "Where a party seeks to challenge a statute or policy prior to its enforcement, the ripeness doctrine requires that the challenge grow out of a 'real, substantial controversy between parties' involving a 'dispute definite and concrete.'" *Marchi*, 173 F.3d at 478 (quoting *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298 (citation omitted)).  "[T]he ripeness inquiry requires courts to consider both the fitness

---

[10]"As applied" challenges "depend on the facts of the case at bar."  *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 185 (2d Cir. 2006).

of the issues for judicial decision and the hardship resulting from withholding judicial consideration."  *Id*. (citing *Abbott*, 387 U.S. at 149).

KFA-r does not state or imply that it applies to material one student wishes to give to another or contain in its text a time, place, or manner regulation regarding the distribution of written material.  The parties agree, however, that the District intends KFA-r to govern students' requests to distribute written materials to other students and that KFA-r includes its unwritten, but well-established, practice of enforcing a time, place, and manner restriction on the distribution of written speech.  Further, it is uncontroverted that the District relied, in part, on KFA-r when it denied plaintiffs' distribution request; that KFA-r requires the Assistant to the Superintendent to review written material before it is distributed to students; and that if the District approved her request, the only way M.B. could distribute her flyer would be pursuant to the District's distribution procedure, i.e., through her teacher to every student in the class.  Thus, plaintiffs have presented a legal issue "eminently fit" for review.  *Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 227 (2d Cir. 1998) (holding that because the plaintiffs' "health claims" would be subject to an allegedly unconstitutional Food and Drug Administration preclearance procedure, the court could consider the plaintiffs' prior restraint challenge on the merits).

Further, in assessing the possible hardship to the parties resulting from withholding judicial consideration, the Court must "ask whether the challenged action creates a direct and immediate dilemma for the parties."  *Marchi*, 173 F.3d at 478.  As stated, because the District has foreclosed plaintiffs' proposed method of distribution, the only avenue left for her to pursue is KFA-r, with which, the District asserts, she must comply if she wants to distribute material to

students.  Thus, withholding judicial decision would result in a hardship on M.B.  Accordingly, the Court turns to the merits of plaintiffs' claim.

It is well-settled that the District may restrict the time, place, and manner of protected speech.  *Bery v. City of New York*, 97 F.3d 689, 696 (2d Cir.1996) (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).  To withstand constitutional scrutiny, however, such restrictions "must be (1) content neutral, in that they target some quality other than substantive expression; (2) narrowly tailored to serve a significant governmental interest; and (3) permit alternative channels for expression."  *Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006) (citing *Ward*, 491 U.S. at 791).  "This standard is commonly referred to as intermediate scrutiny."  *Id*. (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 98 (2d Cir. 2006) (noting that "we apply 'intermediate scrutiny' to regulations of expressive activity that are not based on content")).

In this case, viewing the facts in the light most favorable to the District, and assuming that KFA-r's restrictions on the time, place, and manner of distributing written material are content neutral, the Court finds the restrictions fail constitutional scrutiny as applied to student speech because they restrict considerably more than is necessary to serve the District's interests in ensuring " the consistent, orderly and non-disruptive distribution of documents," Def's Mem. of Law in Opp. to Sum. Jud., p. 9, avoiding unnecessary controversy among students, and preventing a "litter problem".

"In a First Amendment challenge, the government bears the burden of showing that its restriction of speech is justified under the traditional 'narrowly tailored' test."  *United States v. Doe*, 968 F.2d 86, 90 (D.C.Cir. 1992).  "The 'narrowly tailored' standard does not tolerate a

time, place, or manner regulation that may burden substantially more speech than necessary to achieve its goal, nor does it require that the least restrictive alternative available be used." *Deegan*, 444 F.3d at 143 (citing *Ward*, 491 U.S. at 788-89).

Here, pursuant to KFA-r, teachers distribute written material (that the District has reviewed and determined serves a school purpose in some manner) directly to every student in the classroom at the end of the school day.  Given the extent of the District's review of the written material, as well as the teacher's involvement in distributing the flyers to students in the classroom, students, parents, and members of the public reasonably could perceive any written materials a student received through this process as bearing the imprimatur of the school. Private student speech, therefore, would become school-sponsored speech, bringing it within the ambit of *Hazelwood* and enabling the District to exercise "editorial control over the style and content of student speech . . . so long as their actions are reasonably related to legitimate pedagogical concerns." *Hazelwood*, 484 U.S. at 273.   As discussed, *Tinker* protects all private student speech which is not substantially disruptive.  *See Guiles*, 461 F.3d at 326.

The District has offered no evidence showing that this regulation, which, in effect, prohibits all written student speech that is not related to the elementary school's pedagogical concerns, is narrowly tailored to serve its interests in the orderly distribution of written material and the avoidance of unnecessary controversy and litter on school premises.  Thus, the District's time, place, and manner regulation, as applied, fails to withstand constitutional scrutiny.[11]

---

[11] Because the Court concludes that the District's time, place, and manner regulation is not narrowly tailored to serve its objectives, the Court need not address whether there are "adequate alternative channels for expression."  *Deegan*, 444 F.3d at 144.

### 2.    KFA-r – Facial Challenge

Plaintiffs challenge KFA-r on its face as an unconstitutional prior restraint.  Plaintiffs complain that KFA-r is unconstitutional on its face because: (1) it subjects all written speech to content review before distribution to students but does not provides objective criteria to guide school officials and therefore vests officials with discretionary authority to deny a literature distribution request arbitrarily; and (2) lacks a definite time frame within which school officials must make a decision to grant or deny a request.

The District asserts that plaintiffs' challenge to KFA-r is not yet ripe for review because plaintiffs believe KFA-r does not apply to their request and, in any event, seek permission to distribute M.B.'s flyer without the District's involvement.  For the same reasons discussed in section, III.B.1.d., *infra*, and because it is undisputed that the District already invoked KFA-r in denying M.B.'s distribution request and will not allow M.B. to distribute any written material to another student without first submitting it to Mr. Nuzzo, in accordance with KFA-r, the Court finds that plaintiffs have presented a legal issue "eminently fit" for review.  *Nutritional Health Alliance*, 144 F.3d at 227.  Further, in assessing the possible hardship to the parties resulting from withholding judicial consideration,  *Marchi*, 173 F.3d at 478, because it is uncontroverted that KFA-r applies to the flyer she seeks to distribute and that she must submit her flyer to Mr. Nuzzo for approval prior to distribution, withholding judicial decision as to whether KFA-r is an unconstitutional prior restraint would result in a hardship on M.B.  Accordingly, the Court turns to the merits of plaintiffs' claims.

KFA-r conditions an individual's distribution of literature to students on permission from the District, thus, it constitutes a prior restraint on speech. *See Beal v. Stern*, 184 F.3d

117, 124 (2d Cir. 1999) ("Because the Rules condition the exercise of expressive activity on official permission – a Parks Department permit – they do constitute a 'prior restraint' on speech."); *Lusk v. Village of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007) ("A law requiring prior administrative approval of speech falls within the prior restraint rubric.").

Plaintiffs contend that KFA-r is unconstitutional because it is a prior restraint on the distribution of written material.  "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).  Generally, there is a "heavy presumption" against the validity of a prior restraint, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963).  The Second Circuit, however, has "declined to hold that a system of prior restraint is presumptively unconstitutional" in schools because of the "unique requirements of the educational process". *Thomas v. Board of Educ.*, 607 F.2d 1043, 1049-50 (2d Cir. 1979) (citing *Eisner*, 440 F.2d at 805).  Thus, plaintiffs' argument that KFA-r is unconstitutional because it is a prior restraint, is without merit.

### a.    Objective Criteria

Plaintiffs challenge KFA-r as unconstitutional on its face because it lacks objective criteria by which a school official must judge a literature distribution request.  Specifically, plaintiffs assert that the substantive criteria KFA-r prescribes to judge a literature distribution request are unconstitutional because they allow school officials to discriminate on the basis of the content of the message.

> A government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view. To curtail

> that risk, a law subjecting the exercise of First Amendment freedoms to the prior
> restraint of a license must contain narrow, objective, and definite standards to guide
> the licensing authority. The reasoning is simple: If the permit scheme involves
> appraisal of facts, the exercise of judgment, and the formation of an opinion by the
> licensing authority, the danger of censorship and of abridgment of our precious First
> Amendment freedoms is too great to be permitted.

*Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130-31 (1992) (internal quotation

marks and citations omitted).  "The Supreme Court has warned that '[r]egulations which *permit*

the Government to discriminate on the basis of the content of the message cannot be tolerated

under the First Amendment.'"  *Lusk*, 475 F.3d at 493-94 (quoting *Forsyth County*, 505 U.S. at

135 (emphasis added)).  Thus, if KFA-r "'vests unbridled discretion in a government official

over whether to permit or deny expressive activity'", it is unconstitutional.  *Beal*, 184 F.3d at

125 (quoting *City of Lakewood v. Plain Dealer Pub. Co*., 486 U.S. 750, 755 (1988) (alteration

omitted)).

KFA-r authorizes the Assistant to the Superintendent to permit the distribution of

literature which "is not primarily of a proprietary nature" and addresses "students [sic] needs

and/or interests".  KFA-r further specifies that any request to distribute literature that serves "no

school purpose" "shall be denied".  KFA-r contains no definitions or other criteria.  When

evaluating a facial challenge to the constitutionality of a regulation the Court must examine "not

only the text of the ordinance, but also any binding judicial or administrative construction of it."

*MacDonald v. Safir*, 206 F.3d 183, 191 (2d Cir. 2000).  The Court is also required to "consider

the well-established practice of the authority enforcing the ordinance."  *Id*.

Superintendent Matousek and Mr. Nuzzo, the Assistant to the Superintendent, testified

that there are no other written or unwritten standards to help determine whether to approve or

36

deny a request to distribute literature.  Mr. Nuzzo testified that, generally, the District would deny any request from a "profit organization".  In determining whether literature is of a "proprietary nature" the District looks at whether the organization is "for-profit", although that is not determinative and the District would look at the "specifics of the request", which could include "a hundred different reasons" – such as holding a school dance at a Sheraton Hotel. The District will not allow "venues to come in and sell products, promote products" although it will "send home fundraisers for the PTO and such."

Regarding school purpose, Mr. Nuzzo explained that:

there [are] only so many hours in the school day that teachers that we have and information that we can give them, so we are careful in what the purpose is.  Where does it fit into the scheme of curriculum, where does it fit into the scheme of enrichment, whatever, their purposes may or may not fit ours. . . .
policies are general and purpose could be described in many ways, that's why I would always refer to our superintendent, our cabinet and counsel as to whether or not it does mean purpose. So pretty [sic] hard for me to identify purpose in a broad context.  But specifically, again, it goes back to what is this going to do for the good of all of our children, so to speak.

Superintendent Matousek also stated that one of the District's "core performance areas" includes "school/community relations and engaging students in after school activities to make sure that they're safe" and that during times "when students do not have school . . . we try to assist families in providing activities so their students are safe."

In his affidavit, Mr. Nuzzo stated that when a flyer comes in, he examines it to "ensure that they are appropriate flyers, containing no inappropriate language, or improper content." Mr. Nuzzo testified that when considering whether a flyer's content is "improper" the District "tr[ies] to bring it back to . . . is it appropriate for the school-aged children matching a school purpose or need" and in that regard Mr. Nuzzo looks to the flyer or the activity itself.

Superintendent Matousek testified there are no guidelines to help determine whether to approve or deny a request, and that she and Mr. Nuzzo "just try to look at the policy and the intent of the policy."   Finally, Mr. Nuzzo and Superintendent Matousek testified that if unsure about the content of any flyer they might consult one another or the District's legal counsel.

Even viewing these facts in the light most favorable to the District, no reasonable fact finder could conclude that KFA-r sets forth any guidelines or definitions interpreting what "students [sic] needs and/or interests" or "school purpose" are, or that District officials have a well-established practice applying KFA-r or construing it which would illuminate these parameters on written speech.  Therefore, KFA-r fails to provide guidance necessary to the Assistant Superintendent or Superintendent charged with deciding whether a flyer should be approved for distribution to students.  Further, District officials' consideration of the "good of all our children" is subjective and therefore fails to pass constitutional muster.  *See e.g. Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-51 (1969) (finding unconstitutional ordinance that "conferred upon the City Commission virtually unbridled and absolute power to prohibit any 'parade,' 'procession,' or 'demonstration' on the city's streets or public ways" because "in deciding whether or not to withhold a permit, the members of the Commission were to be guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience.'"); *Million Youth March, Inc. v. Safir*, 18 F.Supp.2d 334, 344 (S.D.N.Y. 1998) (finding ordinance "which allows licenses to be denied in the 'best interest' of the community for unlisted or listed reasons-including the good character of the event's sponsor-is a virtual prescription for unconstitutional decision making").  Thus, there is nothing in the regulation which would prevent District officials from exercising their virtually

38

unfettered discretion to suppress disfavored speech or disliked speakers. Accordingly, KFA-r, on its face, violates the First Amendment.

### b. Time Limit

Plaintiffs next argue that KFA-r is flawed, on its face, because it does not contain a time limit within which District officials must decide to grant or deny the request. In *Freedman v. Maryland*, the Supreme Court finding that a state law that conditioned expression on a licensing body's prior approval of content "presents peculiar dangers to constitutionally protected speech" 380 U.S. 51, 57 (1965), and outlined several procedural safeguards that content-based, *see Thomas v. Chicago Part District*, 534 U.S. 316 (2002) (*Freedman* factors apply to *content-based* regulations of speech), regulations must contain to satisfy the First Amendment, including a prescription that the relevant authority reach a decision whether to grant or deny a request "within a specified brief period." *Freedman*, 380 U.S. at 59. In this case, the undisputed evidence shows that KFA-r requires school officials to review and approve the content of written material to, *inter alia*, ensure it serves a school purpose before it may be distributed to students. *Cf., Thomas*, 543 U.S. at 322 (finding *Freedman* did not apply where the Park District's ordinance did "not authorize a licensor to pass judgment on the content of speech, [since n]one of the grounds for denying a permit has anything to do with what a speaker might say."). Thus, KFA-r must contain a prescription that school officials decide whether to grant or deny a distribution request "within a specified brief period" to satisfy the First Amendment. *Freedman*, 380 U.S. at 59.

The District asserts that both KFA-r, and its implementation of KFA-r, demonstrate that there is a time frame within which officials must make a decision: one week. KFA-r states that

the District must receive any request not later than one week prior to the proposed distribution date.  Nothing in KFA-r, or the District's implementation of it, however, indicates that the District maintains a specific time frame for deciding whether to grant or deny a request to distribute a flyer.  KFA-r only specifies that a request must be made one week prior to the requested distribution date; it does not require District officials to make a decision within that amount of time or even notify the requester of any decision.  Indeed, Mr. Nuzzo testified that if a requester has not received a decision and the date of the proposed distribution passes, he or she can assume the District denied the request.  Although Mr. Nuzzo testified that "[w]e try to process [requests] within reason", he could not quantify the average amount of time it takes for the District to process a request for distribution because "some may require our counsel and depending on the agenda that [counsel] has in the office, we are sometimes dependent on a response."  Mr. Nuzzo stated that there have been occasions when a request took more than two weeks to process, but that it would be rare for a request to take more than a month to process.

Superintendent Matousek similarly testified that there was no average time within which to process a request because each request is different and that there have been times when it has taken the District a day to process a request and times when it has taken two weeks to process a request.  Superintendent Matousek, however, could not recall whether there was a time when it took more than a month to decide whether to approve or deny a request to distribute materials.

Even viewing the facts in the light most favorable to the District, there is no evidence that the District has or operates within a specific time period within in deciding whether to grant or deny a request to distribute a flyer.  "To be valid, the regulation must prescribe a definite brief period within which review of submitted material will be completed."  *Eisner*, 440 F.2d at

40

810. Thus, KFA-r does not satisfy the *Freedman* requirements applicable to content-based prior restraints of speech.

### C.        Second Cause of Action – Equal Protection

The second cause of action in the complaint alleges that the District violated M.B.'s right to Equal Protection under the Fourteenth Amendment.  The District seeks summary judgment dismissing this cause of action.  Although plaintiffs have not opposed the District's motion in this regard, the Court must still review the record to ascertain whether there are questions of fact requiring trial.  *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) ("Even unopposed motions for summary judgment must fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law.") (Internal quotation marks omitted).

To prove a selective enforcement claim, a plaintiff must demonstrate that the District applied the regulation to her differently than it applied the regulation to similarly situated individuals and that the difference was intentional and unreasonable.  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam); *Harlen Assocs. v. Incorporated Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

In this case, plaintiffs have failed to adduce evidence demonstrating that M.B. was similarly situated to others to whom the District did not require to comply with KFA-r.  M.B. sought to distribute a number of copies of her personal statement to her classmates during non-instructional time.  Although the record does not indicate the number of flyers M.B. wished to distribute, it is undisputed M.B. sought to distribute more than one. There is evidence that M.B. received written literature from other students, including a birthday invitation.  There is,

41

however, no evidence that any District official was aware that the student from whom M.B. received the literature gave it to M.B. on District property but did not require the student to comply with KFA-r.  Nor is there any evidence that any other student distributed more than one piece of literature.  Thus, plaintiffs have not shown that there were any similarly situated individuals.  Accordingly, the District's motion for summary judgment dismissing plaintiffs' second cause of action alleging a violation of her right to Equal Protection is granted.

### D.    Third Cause of Action – Establishment Clause

The District moves for summary judgment dismissing plaintiffs' third cause of action which alleges that the District's "Policy and actions" violate the Establishment Clause. Plaintiffs have not opposed this aspect of the District's motion.  According to the complaint, it is the District's review of the content of written speech, ban on all written speech it deems religious, lack of a secular purpose, hostility toward religion, and excessive entanglement with religion that violate the Establishment Clause.  Having reviewed the record, however, the Court finds the District has sustained its burden of showing that there are no issues of material fact requiring trial.

As discussed, the *Lemon* test governs the Establishment Clause analysis in this case. Thus, the Court must consider:  "[(1)] whether the government acted with the purpose of advancing or inhibiting religion and [(2)] whether the aid has the effect of advancing or inhibiting religion."  *DeStefano v. Emergency Housing Group, Inc.*, 247 F.3d 397, 406 (2d Cir. 2001) (internal quotation marks, alterations, and citations omitted).

In this case, the evidence, even viewed in the light most favorable to plaintiffs, does not suggest that the District acted with the purpose of inhibiting religion.  At least two of the

reasons the District proffered for denying M.B.'s request, namely, her failure to comply with KFA-r and concern about a potential "litter problem", are wholly secular.  Further, although the remaining reasons the District gave for not allowing M.B. to distribute her flyers, including the District's concern regarding plaintiffs' proposed method of distribution and that students or parents might think that the District endorsed and fostered religious or proselytizing materials, are "involved with religion" and the religious nature of the flyers, such reasons center on the District's interest in avoiding an Establishment Clause violation and do not "bespeak an intent to inhibit religion itself."  *Peck*, 426 F.3d at 634.  This evidence together with the testimony by District officials regarding their concerns about M.B.'s flyers does not demonstrate hostility toward religion.  Indeed, District officials uniformly testified that neither they nor any policy prohibited M.B. from speaking to other students during non-instructional time about her religious beliefs.  Thus, there are no triable issues of fact as to whether the District acted with the purpose of inhibiting religion.

The Second Circuit employs three primary criteria to determine whether the government's actions have the effect of advancing or inhibiting religion: "whether the action or program results in governmental indoctrination; defines its recipients by reference to religion; or creates an excessive entanglement."  *DeStefano*, 247 F.3d at 406 (internal quotation marks, alterations, and citations omitted).  Here, plaintiffs conclusorily state in the complaint that the District's actions and policy excessively entangle it with religion.  The undisputed facts, however, show that the District's entanglement with religion in denying M.B.'s request to distribute her flyers was minimal.  It included school officials' review of M.B.'s proposed flyers and consultation with one another and legal counsel.  This evidence, even viewed in the light

most favorable to plaintiffs, constitutes *de minimis* entanglement in religion.  *See Peck*, 426

F.3d at 635 (finding it "clear . . . that whatever limited religious discernment was entailed in the

decision to censor the robed figure (which both parties identify in their briefs as 'Jesus')" from

a kindergarten student's poster, the school "[d]istrict's resulting 'entanglement' in religion was

*de minimis* at most.").  Thus, there is no evidence indicating that a reasonable observer would

understand the District's action toward plaintiffs or application of KFA-r, which contains no

reference to or prohibition against religion, to inhibit religion.  Accordingly, the District is

entitled to summary judgment dismissing plaintiffs' Establishment Clause claim.  The third

cause of action is dismissed.

> ### E.      Preliminary Injunction and Security Bond

Since plaintiffs are entitled to judgment on their first cause of action, violation of their

right to Freedom of Speech, they are also entitled to injunctive relief.  Thus, the Court need not

reach their motion for a preliminary injunction on this issue.  Accordingly, plaintiffs' motion for

a preliminary injunction and motion to waive the posting of a security bond for a preliminary

injunction are denied as moot.

## IV.      CONCLUSION

By this action, plaintiffs seek an order declaring the District's actions, and KFA-r,

unconstitutional and enjoining the District from prohibiting M.B. from distributing her personal

statement.  The Court has found: that the District's actions infringed M.B.'s right to Freedom of

Speech in violation of the First Amendment; that its time, place, and manner regulation of

written speech is unconstitutional as applied to M.B.; and that while the District constitutionally

may maintain a proscription against distributing written or printed material to students without

prior consent, KFA-r lacks objective criteria and fails to set forth a specific time frame within which school officials must make a decision.  Thus, KFA-r, as written, is unenforceable. Accordingly, based on the above, it is hereby

**ORDERED** that plaintiffs' motion for summary judgment (Dkt. no. 23) on the first cause of action in the complaint is GRANTED; and it is further

**ORDERED** that the Clerk of the Court is directed to enter judgment for plaintiffs on the first cause of action; and it is further

**DECLARED** that the District's time, place, and manner regulation on the distribution of written speech by M.B. is invalid; and it is further

**ORDERED** that the District is enjoined from enforcing its time, place, and manner regulation against M.B.; and it is further

**DECLARED** that KFA-r is invalid on its face; and it is further

**ORDERED** that the District is enjoined from enforcing KFA-r; and it is further

**ORDERED** that nothing herein shall limit any other lawful exercise of the District's authority including, but not limited to, maintaining a proscription against distributing written or printed material without prior consent and reasonable time, place, and manner regulations for the distribution of written material

**ORDERED** that plaintiffs' motion for a preliminary injunction (Dkt. no. 9) is DENIED as moot; and it is further

**ORDERED** that defendant's motion for summary judgment (Dkt. no. 25) on the first cause of action in the complaint is DENIED; and it is further

**ORDERED** that defendant's motion for summary judgment (Dkt. no. 25) on the second and third causes of action in the complaint is GRANTED; and it is further

**ORDERED** that the second and third causes of action in the complaint are DISMISSED with prejudice; and it is further

**ORDERED** that plaintiffs' motion to waive posting a security bond for any preliminary injunction (Dkt. no. 10) is DENIED as moot.

**IT IS SO ORDERED.**

**Date:  March 29, 2007**

_____

Norman A. Mordue
Chief United States District Court Judge

46